IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


LISA SALTER,

       Plaintiff,

-vs-                    CASE NO.:3:12-cv-534-MEW/CJK

FLORIDA DEPARTMENT OF REVENUE,

       Defendant.

_____/


### DEPOSITION OF LISA SALTER


Reported by Elaine Richbourg, a Court Reporter

and Notary Public, State of Florida at Large, in the

offices of Daniel "Chappie" James Building, 160

Governmental Center, Fifth Floor, Room 501B,

Pensacola, Florida, on Thursday, April 4th, 2013,

commencing at approximately 9:50 A.M.


ELAINE RICHBOURG
COURT REPORTER
2320 Brightview Place
Cantonment, Florida 32533
(850) 968-6465
FAX (850) 968-5441
elainerichbourg@cox.net

**ORIGINAL**

2

1                      APPEARANCES

2    For the Plaintiff:

3                          JAMES GARRITY, ESQUIRE
                           MARIE A. MATTOX, ESQUIRE
4                          310 East Bradford Road
                           Tallahassee, FL   32303
5

6    For the Defendant:

7                          WILLIAM K. THAMES, II, ESQUIRE
                           LOZIER, THAMES, FRAZIER, P.A.
8                          24 West Chase Street
                           Pensacola, FL   32502-5614
9

10

11   COURT REPORTER:
               ELAINE RICHBOURG
12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    INDEX OF TRANSCRIPT

2  WITNESS:

3      LISA SALTER

4          Direct Examination by Mr. Thames        04

5          Cross-Examination by Mr. Garrity

6  Certificate of Oath...................................181

7  Reporter's Deposition Certificate.....................182

8

9                      STIPULATION

10

11      It is stipulated and agreed by Counsel for the

12      parties that the deposition is taken for the

13      purpose of discovery and/or evidence; that all

14      objections save as to the form of the question

15      are reserved to the time of trial; and that the

16      reading and signing of the deposition are not

17      together, waived with notice of the original

18      hereof.

19                  *  *  *  *  *  *  *

20

21

22

23

24

25

4

1   Whereupon,

2                    LISA SALTER,

3   having been first duly sworn to tell the truth, the whole

4   truth and nothing but the truth, testified as follows:

5                 **DIRECT EXAMINATION**

6   BY MR. THAMES:

7       Q     Would you please state your full name?

8       A     It's Lisa Joy Salter.

9       Q     And, Ms. Salter, your attorney has

10  indicated he's gone over with you the ground rules

11  of a deposition.  I'm going to ask you some

12  questions.  Please answer my questions truthfully,

13  to the best of your ability.  If, for any time you

14  do not understand my question, please ask me to

15  rephrase it, I would be happy to do so.  If there's

16  any other problems with the question or anything, at

17  all, just please ask me to explain it and I'll try

18  to do it.  If you answer a question, I will assume

19  that you've understood; is that okay?

20      A     Yes.

21      Q     Okay.  What is your date of birth?

22      A     2/21/61.

23      Q     Okay.  Have you ever been known by any

24  other names, other than Lisa Joy Salter?

25      A     Floyd.

1    Q    Floyd?

2    A    F-L-O-Y-D.

3    Q    Was that your maiden name?

4    A    Yes.

5    Q    What's your current address?

6    A    397 -- I'm sorry, 380 Highway 97.

7    Q    Highway 97.

8    A    Cantonment Florida, 32533.

9    Q    How long have you lived there?

10   A    Since, approximately, 2007.

11   Q    Okay.  Does anyone else live there with

12   you?

13   A    Yes.

14   Q    Okay.  Who would that be?

15   A    My husband.

16   Q    How long have you been married?

17   A    I was married in '86.

18   Q    Okay.  Is that your only marriage?

19   A    Yes.

20   Q    Okay.  What's your husband's name?

21   A    Elvin Salter.

22   Q    Do you have any children?

23   A    Yes.

24   Q    How many children do you have?

25   A    Two.

6

```
 1        Q    Okay.  Boys or girls?

 2        A    A boy and a girl.

 3        Q    How old is your son?

 4        A    Approximately, 28.

 5        Q    Twenty-eight, okay.  How old is your

 6   daughter?

 7        A    Can I interrupt you one second.  I was

 8   married in 1982.  I'm sorry.  I was married in 1982.

 9        Q    And how old is your daughter?

10        A    She will be 21 on her birthday in May.

11        Q    Okay.  What is your husband, Elvin, what

12   does he do for a living?

13        A    He's retired.

14        Q    Okay.  Where did he retire from?

15        A    Whitesell and Green Construction.

16        Q    In the documents your attorney provided to

17   us, you have a valid Florida driver's license; is

18   that correct?

19        A    Yes.

20        Q    Okay.  Any restrictions on it?

21        A    Not that I'm aware of.

22        Q    Okay.

23        A    Except for my contacts.

24        Q    Tell us about your educational background.

25   Let's start with high school.  Where did you go to
```

7

1    high school?

2         A    I started off with Tate and graduated at

3    Pensacola High.

4         Q    And where did you go to school after that?

5         A    I went to PJC for a little while.  And I

6    went to George Stone Vocational School for a little

7    while.

8         Q    Did you receive any degrees or

9    certificates or anything like that from either PJC

10   or George Stone?

11        A    No, I did not.

12        Q    Okay.  What did you study at PJC?

13        A    A typing course.

14        Q    What did you study at George Stone?

15        A    It was a secretarial course.

16        Q    Is there any reason why you didn't

17   complete degrees or certificates at either one of

18   those institutions?

19        A    I became employed.

20        Q    And I'll ask you about that in a little

21   bit.  Have you ever served in the military?

22        A    No, I have not.

23        Q    Now, any other educational institutions

24   you've attended, other than graduated from Pensacola

25   High School, attending PJC and attending George

1   Stone?

2        A    Just training courses on the job.

3        Q    Okay.  And that's with the State of

4   Florida?

5        A    Yes, sir.

6        Q    Tell us about the training courses you've

7   attended?

8        A    On-the-job?

9        Q    Yes, ma'am.

10       A    They're all job-related.

11       Q    And what, generally, types of training

12  courses were there?

13       A    Training to perform my duties, things in

14  regards to policies and procedures, directions as to

15  my job duties, job aids, things that will help me

16  perform my duties.

17       Q    Okay.  Now, let me ask you a little bit

18  about your personal medical history.  Do you have

19  any medical conditions?

20       A    At this time?

21       Q    Yes, ma'am.

22       A    Due to stress I'm suffering from vertigo.

23       Q    Anything else?

24       A    Depression.

25       Q    Anything else?

1       A       I have a thyroid problem.

2       Q       Okay.  Tell us about the stress.  When did

3    you first start having problems with stress.

4       A       In, approximately, around 2010.

5       Q       And what was the cause of the stress?

6       A       Being retaliated and harassed at work.

7       Q       What about the vertigo, when did you start

8    experiencing problems with that?

9       A       Just recently.

10      Q       Does that have anything to do with your

11   job?

12      A       They think it's stress related.

13      Q       What about the depression, when did you

14   start having problems with depression?

15      A       I've been depressed and stressed since,

16   approximately -- Kathy Satterwhite was hired,

17   probably, around March, 2009, it started and it has

18   increased over the years.

19      Q       Okay.  And you're still suffering from

20   both stress and depression, to this day?

21      A       To this day.

22      Q       What about your thyroid, what's the

23   problem with that?

24      A       I have the kind that makes you gain

25   weight.

1     Q     Okay.  Has anybody told you what that's

2   caused by?

3     A     I've had that for years, sir.  Before,

4   2009.

5     Q     And does that have anything to do with

6   your job or the situation on your job?

7     A     No.

8     Q     Are you currently taking any medications

9   for any of these conditions?

10    A     Yes.

11    Q     Okay.  Please tell me what you're taking?

12    A     I'm taking Valium.

13    Q     Okay.  Anything else?

14    A     I'm taking Ambien to sleep.

15    Q     Ambien?

16    A     Uh-huh.

17    Q     Anything else?

18    A     I'm taking Synthroid for my thyroid.

19    Q     Syn --

20    A     Synthroid.

21    Q     Synthroid.  Is that S-Y-N-T-H-R-O-I-D?

22    A     I think that's correct.

23    Q     Who treats you for your stress and

24   depression?

25    A     My doctor.

1    Q    Okay.  Who is your doctor?

2    A    Virtusio.

3    Q    Can you spell his name?

4    A    It's a she.  Virtusio, V-I-R-T-U-S-I-O.

5    Q    Okay.  Do you know her first name?

6    A    I'm not really sure.

7    Q    Okay.

8    A    It begins with an L.

9    Q    Okay.

10    A    It should be in my paperwork.

11    Q    Okay.  Is she located here in Pensacola?

12    A    Yes, she is.

13    Q    Do you know what street?

14    A    Town Street, T-O-W-N.

15    Q    Does she, also, treat you for depression?

16    A    Yes.

17    Q    Okay.  What type of doctor is she?

18    A    She's a family doctor.

19    Q    What about your thyroid, who treats you

20    for that condition?

21    A    She does.

22    Q    Dr. Virtusio?

23    A    Yes.

24    Q    Okay.

25    A    And I'm seeing a neurologist at this time,

1    as well.

2         Q    Okay.  And who is the neurologist?

3         A    His name Dr. Dmytrenko.

4         Q    Dmytrenko?

5         A    Uh-huh.

6         Q    Is it D-E-N-E-Y --

7         A    I have no idea.

8         Q    I think I know his name.  He's in

9    Pensacola here, also?

10        A    Yes.

11        Q    Why do you see Dr. Dmytrenko for the

12   neurology?

13        A    Because I thought it was something other

14   than stress so they did all these tests.  And, come

15   to find out, it has to be nothing but stress because

16   they can't find anything else.  So he's treating me

17   for my vertigo.

18        Q    For your --

19        A    Vertigo.

20        Q    For your vertigo.  Are you taking any

21   medications for vertigo?

22        A    Valium.

23        Q    Valium.  Who prescribes the Valium and the

24   Ambien?

25        A    The Valium is prescribed by Dr. --

1     Q    Pardon me?

2     A    I don't really know how to pronounce his

3  name, the neurologist.

4     Q    The neurologist, Dmytrenko?

5     A    It's not Dmytrenko but --

6     Q    It's the same guy?

7     A    It's the same guy, the neurologist.

8     Q    Are you currently or have you taken the

9  Valium or the Ambien within the last 12 hours?

10    A    Yes.

11    Q    Does it affect your ability to give

12  honest, truthful answers in this deposition?

13    A    No.  Actually, it helps.

14    Q    Okay.  Helps with the stress?

15    A    Yes, it does.

16    Q    Have you ever seen a psychologist or

17  psychiatrist or a mental health counselor or

18  anything like that?

19    A    I was seeing a therapist at one time.

20    Q    Okay.  Who is that?

21    A    What's her name, Longora -- Longora.

22    Q    And why were you seeing her?

23    A    Because I was being harassed and

24  retaliated on the job.

25    Q    When was the last time you saw the

1   therapist?

2        A      Sometime the latter part, I can't recall

3   the exact date, but it was the latter part of 2010.

4        Q      Have you ever had any on-the-job injuries?

5        A      No.

6        Q      How about off the job injuries, a trip and

7   fall, slip and fall, automobile accidents, anything

8   like that where you required medical treatment?

9        A      No.

10       Q      Car accidents?

11       A      No.

12       Q      Okay.  Have you ever been -- have you ever

13   been hospitalized?

14       A      Yes.

15       Q      And what was that for?

16       A      I had gastric bypass surgery.

17       Q      Where was that performed at?

18       A      Sacred Heart here in Pensacola.

19       Q      Sacred Heart Hospital on 9th Avenue?

20       A      Yes, sir.

21       Q      And when was that?

22       A      September, 2007.

23       Q      Any other hospitalizations?

24       A      Yes, sir.

25       Q      Okay.  Please tell me about them.

```
 1      A     I had a thigh lift because of the weight
 2   gain.
 3      Q     Pardon me?
 4      A     A thigh lift.
 5      Q     A thigh lift?  And when was that?
 6      A     I don't recall the exact day but it was
 7   after my -- sometime after my surgery.
 8      Q     Could it have been two thousand, what,
 9   approximately?
10      A     I don't really want to guess but either
11   the latter part of 2009 or the beginning of 2010.
12      Q     What do you contribute the weight gain to,
13   if anything?
14      A     My thyroid, sir.
15      Q     Okay.  Any other hospitalizations?
16      A     I had a breast lift.
17      Q     And who did that?
18      A     Dr. Wolford.
19      Q     Wolford?
20      A     Yes, sir.
21      Q     W-O-L-F-O-R-D.
22      A     Uh-huh.
23      Q     And is he here in Pensacola?
24      A     No.  He's left town.
25      Q     Okay.  Where was the procedure performed
```

1    at?

2         A    The Baptist Hospital in Gulf Breeze.

3         Q    And when was that performed,

4    approximately?

5         A    The same time as the thigh lift.

6         Q    Okay.  Did Mr. Wolford, also, do the thigh

7    lift?

8         A    Exactly.

9         Q    Okay.  Any other hospitalizations?

10        A    Yeah, I recently had surgery.

11        Q    Okay.  What type of surgery was that?

12        A    I had my gall bladder removed.

13        Q    Okay.  What was wrong with your gall

14   bladder?

15        A    It was infected.

16        Q    Who did that surgery?

17        A    Dr. Lord.

18        Q    Dr. Lord.  Okay.  Where was that surgery

19   performed?

20        A    At Sacred Heart Hospital here in

21   Pensacola.

22        Q    Any other hospitalizations?

23        A    Not that I can recall, at this time.

24        Q    I assume you would have, also, had

25   hospitalizations for child birth?

1    A    Oh, you want to go back to the child

2  birth?

3    Q    Okay.  Well, I just want to make sure I

4  have all your hospitalizations.

5    A    Yeah.  I was in the hospital for the

6  births of my children.

7    Q    What hospital did you deliver at?

8    A    My son was delivered at West Florida and

9  my daughter was adopted.

10    Q    And I asked you about slip and falls, trip

11  and falls, car accidents but have you ever been in

12  any car accidents where you had any type of medical

13  treatment?

14    A    Not that I can recall, at this time.  I do

15  want to go back to one thing though.  When my doctor

16  was treating for my swollen legs.  I have swollen

17  legs.

18    Q    Okay.

19    A    And sometimes back pain.

20    Q    And who treats you for those conditions?

21    A    My family doctor, Dr. Virtusio.

22    Q    And what is the cause of your swollen legs

23  and your back pain?

24    A    The thigh lift that I had contributes to

25  my leg swelling.  But the back, I do not know.

1        Q    Now, as far as your current, physical
2    condition, and I'm just going to summarize and you
3    tell me if I'm incorrect on any of this.  You're
4    suffering from stress, vertigo, depression, the
5    thyroid problem, swollen legs and back pain.  Is
6    there anything else?
7        A    That's it.  That's all that I can recall
8    at this time.
9        Q    Now, I'd like to ask you about your
10   employment history and why don't we just go ahead
11   and mark this as Defendant's exhibit 1.  And this is
12   a resume that your attorney provided to me in
13   response to documents that we had requested.  When
14   was this resume prepared?
15       A    Sir, I don't recall the exact date.
16       Q    Do you know if it was within the past
17   year?
18       A    I don't want to play a guessing game so I
19   don't recall the exact date.
20       Q    Okay.  As you sit here today, you don't
21   know how old this resume is?
22       A    No.
23       Q    Okay.  Now, you've told us about the
24   education and that's all on there.  Let's go back
25   and start out with the jobs you've held and, I

1    guess, we'll just start on the back page, since

2    that's the most, or the job that you held first, I

3    guess, when you started your career.  Well, actually

4    let me ask you this:  It says job with Youth and

5    Families, Clerk Typist II, was that the first job

6    that you ever held?

7          A    I had a summer job.

8          Q    Okay.  Just tell us generally?

9          A    This is my first job with the State of

10   Florida.

11         Q    Okay.  What type of jobs did you hold

12   prior to working for the State of Florida?

13         A    I worked as a teenager with summer jobs.

14         Q    Okay.  But this -- would this have been

15   the job with the Clerk Typist II with the Youth and

16   Families, would that have been your first full-time

17   job?

18         A    Yes.

19         Q    Okay.  And that was with the State of

20   Florida; correct?

21         A    Yes.

22         Q    Okay.  And is the job description you've

23   written there typed -- typewritten and dictated

24   reports, et cetera, is that what you did?

25         A    As basic as I can recall.

1     Q    Okay.  Anything else that you -- any other

2  skills that you acquired on that job, that you

3  recall?

4     A    Not that I can recall, at this time.

5     Q    Okay.  And then the next job looks like

6  you, also, with the Youth and Families, State of

7  Florida; correct?

8     A    Yes.

9     Q    Okay.  And that was a Secretary II and you

10  listed what you did there; is that accurate?

11     A    As best as I can recall.

12     Q    Okay.  Any other job duties that you had

13  that are not listed?

14     A    Sir, that was back in 1981 to '85, to the

15  best of my knowledge.

16     Q    Okay.  Let me ask you about the job I

17  talked to you about, the Clerk Typist II with Youth

18  and Families and Secretary II job with Youth and

19  Families.  Was that in a different office than you

20  work in today?

21     A    Yes, sir.

22     Q    Okay.  Where was that office located at?

23     A    It was in the Juvenile Justice Center.

24     Q    Okay.  Here in Pensacola?

25     A    Yes.

1      Q     And then the next job you had, was with

2  the State Attorney's office from '85 to '86 as a

3  Legal Secretary III?

4      A     Yes, sir.

5      Q     Okay.  And you've listed your job duties

6  there.  Is that accurate, to the best of your

7  recollection?

8      A     That is correct.

9      Q     Okay.  And let's go back.  The first job

10  that you had with the Clerk Typist II with Youth and

11  Families, why did you leave that job?

12      A     Because I was promoted.

13      Q     Okay.  And the second job you had as

14  Secretary II with Youth and Families, and why did

15  you leave that job?

16      A     Because I was promoted.

17      Q     And then you went to the State Attorney's

18  office, Legal Secretary III and you worked there

19  from '85 to '86.  Why did you leave that job?

20      A     Because child support was taken over by

21  the Department of Revenue and I was interviewed and

22  qualified for the job and was hired.

23      Q     So, the next job you would have had would

24  be with the Florida Department of Revenue; correct?

25      A     Yes.

1       Q    Okay.  And that would have been the job

2  listed here as Child Support Investigator Case

3  Analyst from November of '85 to June of 1996?

4       A    Excuse me?

5       Q    Okay.  I'm looking here at the job you've

6  listed, Department of Revenue Child Support

7  Enforcement, job title and Child Support

8  Investigator Case Analyst, November '86 to June --

9  June '96?

10      A    I thought that was the one we just talked

11 about?

12      Q    Actually, I think we're going to the next

13 one.  Let me just ask you about that:  You've listed

14 your job duties.  Is there any other job duties that

15 you did on that job that you have not listed there?

16      A    This is one I recall to, the best of my

17 knowledge, as of now.

18      Q    And what was your reason for leaving that

19 position?

20      A    I was promoted.

21      Q    Okay.  And then the next job you've listed

22 is with the Department of Revenue, Child Support

23 Enforcement Case Analyst Supervisor from June '96 to

24 June '98 and you've listed duties there.  Are those

25 duties that you've lived accurate, to the best of

1    your knowledge?

2         A    To the best of my knowledge.

3         Q    Okay.  And what was your reason for

4    leaving that job?

5         A    It was stripped away from me.

6         Q    And why was that?

7         A    Because there was an investigation done

8    where Kathy Satterwhite said that I lied on a test.

9    And even though I was given -- I had to hire an

10   attorney and I was given a three day suspension,

11   Kathy's supervisor, at that time, Peg Hutchinson,

12   said she couldn't have me demoted, which is what she

13   wanted to happen to me.  They stripped away my

14   supervisory duties and gave me another title without

15   being a supervisor, without actually having the role

16   of supervisor.

17        Q    Were there any other disciplinary actions,

18   such as reduction in pay or seniority or anything

19   like that?

20        A    No.  I wasn't able to supervise any more.

21        Q    But your pay remained the same?

22        A    Yes.

23        Q    And your seniority remained the same?

24        A    What seniority?  Seniority never counted.

25        Q    Okay.  There's no seniority involved with

1    that?

2        A    No.

3        Q    And there was nothing done with your pay

4    grade, you remained at the same pay level?

5        A    My pay did not change.

6        Q    Okay.  Now, then the next job you

7    indicated you were a caregiver to a relative from

8    June of 2010 to December of 2011.  Was this a sick

9    relative?

10       A    Yes.

11       Q    Okay.  Who was your relative?

12       A    My husband's sister.

13       Q    What was wrong with her?

14       A    She has Alzheimer's and things like that.

15       Q    And were you doing that job at the same

16   time you were working for the Department of Revenue?

17       A    It was just, basically, I wasn't actually

18   getting paid, sir.

19       Q    Okay.

20       A    I was just actually sitting with my

21   sister-in-law.

22       Q    Okay.  But you were --

23       A    But it was a job.

24       Q    I understand.  But you were doing that

25   job, although you were not being paid, at the same

1    time you were working for the State?

2         A    Right.  Exactly.  Without pay.

3         Q    Okay.  And you did that from -- for,

4    approximately, a year and a half.  What happened?

5         A    What happened is that someone moved in

6    with her.

7         Q    Okay.

8         A    She has a relative that lives with her now

9    that's taking care of her.

10        Q    So she got another caregiver?

11        A    Right.  It was, basically, family members

12   just sitting with her is all this was.

13        Q    Okay.

14        A    And I was one of those family members.

15   It's actual experience and not a job.  It's actual

16   experience.

17        Q    Oh, I understand dealing with sick

18   relatives and that's certainly something to be

19   commended for.

20             Now, the next job you've had, according to

21   your resume, is you have worked at the Florida

22   Department of Revenue, Child Support Enforcement,

23   job title, Operations Analyst II from June, '98 to

24   the present; does that sound accurate?

25        A    It's not what I do at this particular

1    time.   So this is an old resume.

2         Q    Okay.   Well, let's talk about the job here

3    you have, this Operations Analyst II from 6/98 to

4    present.   You've listed job duties here under that

5    section, such as credit reporting coordinator,

6    passport coordinator, bankruptcy coordinator, social

7    security number and driver's license coordinator,

8    unemployment compensation coordinator, interviewing

9    clients, privatization coordinator and work with

10   hearing officers.   Now, how long did you do those

11   particular duties?

12        A    Anywhere between the time of 6/98 to the

13   date that I prepared this resume.

14        Q    Okay.   And, as you sit here today, you

15   don't remember when you prepared the resume?

16        A    Correct.

17        Q    Now, when those duties changed, what did

18   they change to?

19        A    These are different jobs and duties I've

20   held from six -- from 6/98 to the day that I

21   prepared this.   And I can't give you exact dates as

22   to when I did these duties.   But anywhere between

23   that time I did experience working these duties.

24        Q    Okay.   Did those duties change to the

25   duties that you do today?

1      A    Yes.

2      Q    Okay.  Have you done the same duties today

3  that you've done since, let's say, the beginning of

4  2010?

5      A    No.

6      Q    Okay.  Well, let's start with 2010.  What

7  have you done starting with, let's say, January,

8  2010 and let's go to the present and just kind of

9  tell me what you've done and how that's changed over

10 time, if it has at all?

11     A    2010, I know I was doing unemployment

12 compensation.

13     Q    Okay.

14     A    I was social security driver's license

15 coordinator, bankruptcy coordinator, passport

16 coordinator, credit reporting coordinator, and I

17 was, also, assigned a list to work for Kathy

18 Satterwhite that was outside of my duties.

19     Q    And can you tell me about the list to work

20 outside your duties for Kathy Satterwhite?

21     A    It took away from my normal job duties.

22 But it was the goal for me to work for Kathy

23 Satterwhite, so I worked the list.

24     Q    And Ms. Satterwhite, at that time, was she

25 your supervisor?

1       A     No.

2       Q     What was her position?

3       A     She worked at -- she was a manager for my

4  supervisor, Becki Nobles.

5       Q     Okay.  So you reported to Ms. Nobles and

6  Ms. Nobles reported to Ms. Satterwhite?

7       A     No.  Ms. Satterwhite reported to

8  Ms. Nobles.

9       Q     Okay.  So your supervisor would have been

10  Ms. Nobles?

11      A     Correct.

12      Q     So as it pertains to you, your chain of

13  command was, you reported to Ms. Nobles who, in

14  turn, reported to Ms. Satterwhite?

15      A     Once again, Ms. Satterwhite reported to

16  Ms. Nobles.

17      Q     Okay.  I'm sorry.  I had it backwards.  At

18  that time what was Ms. Satterwhite's title?

19      A     She was a revenue administrator.

20      Q     And what was Ms. Nobles' title?

21      A     She was the Service Center Manager.

22      Q     And as I understand correctly, what you're

23  telling me is:  You were not supposed to report to

24  Ms. Satterwhite, you were supposed to report to

25  Ms. Nobles, is that accurate or am I --

1      A      Yes.  Exactly.

2      Q      Okay.  Who was Ms. Satterwhite in charge

3  of?  Was she in charge of anybody in particular?

4      A      She had a unit that she was supervising.

5      Q      Okay.  What was her unit?

6      A      It was -- I don't know the exact name of

7  it but I think cross functional.  She was -- it was

8  considered cross functional.

9      Q      What exactly does that mean?

10     A      It handled judicial -- it was like a

11  judicial process.

12     Q      And Ms. Nobles, as a Service Center

13  Manager, what were her supervisory responsibilities,

14  who did she supervise, was it everybody or was it

15  just certain people?

16     A      She supervised me, my counterparts with

17  the same title, Michael Holway, Max Curtis.  She had

18  three RAs that she supervised, which was Kathy

19  Satterwhite, Margaret Coursey, Nancy Jay.  And she

20  had an administrative assistant whose name was Brad

21  Gadlon.

22     Q      Now, you became an Operations Analyst II,

23  according to your resume here, in June of 1998; is

24  that correct?

25     A      As best as I can recall.

30

1     Q     Was that a promotion to that position?

2     A     No.

3     Q     Okay.  How did you come to get that

4  position?

5     A     When I was stripped of my supervisory

6  duties I was -- my titles changed.

7     Q     Now, at the time you become an Operations

8  Analyst II --

9     A     Now, my title might have been something

10  else.  It might have been Management Analysis.  It

11  was changed the title but it was the same duties,

12  the same job description but it could have been

13  Management Analyst or it could have been Operations

14  Analyst.  I don't recall exactly.

15     Q     Were there other people in that same job

16  title at the time you became an Operations Analyst

17  II or whatever they called it, at that time?

18     A     Yes.

19     Q     And who were those people?

20     A     Max Curtis.

21     Q     And who else?

22     A     That's all I can recall, at that time.

23     Q     Was Mr. Holway, also?

24     A     No.

25     Q     Okay.  But there was somebody else?

1      A     The only people that I can recall is me

2   and Max.

3      Q     Okay.   Do you know how long Mr. Curtis had

4   been in that position before you were into the same,

5   I guess, job description or title that he was in?

6      A     I don't recall exactly.

7      Q     Okay.   But you think there was, also,

8   another person?

9      A     No.

10     Q     So there was just two of you, at that

11  time, in that job description?

12     A     Yes.

13     Q     Okay.

14     A     That I recall.

15     Q     When did they hire another person in that

16  job title of Operations Analyst II or whatever it

17  was, at that time?

18     A     I cannot give you specific dates.

19     Q     Okay.   Do you know when Mr. Holway became

20  an Operations Analyst II or whatever that --

21  whatever it was?

22     A     I do know it was a lot later.

23     Q     Later than you?

24     A     (No verbal response)

25     Q     Do you know where Mr. Holway came from?

1      A      He was there.  He's been promoted several

2    times.

3      Q      Was he at the FDOR office for longer than

4    you?

5      A      No.

6      Q      Okay.  Did he hold positions that were

7    higher up or higher paying than you?

8      A      No.

9      Q      Okay.  Do you know what Mr. Curtis' job

10   qualifications are?

11     A      No, I do not.

12     Q      Okay.  What about Mr. Holway, do you know

13   what his job qualifications are?

14     A      I just know he's always had lower

15   positions than I have.

16     Q      Okay.  And by he always had lower

17   positions than you, can you explain to me what you

18   mean?

19     A      I have always been in a higher level than

20   he has been.

21     Q      And by higher level, what do you mean by

22   level?

23     A      I'm a paid pay grade 19.  Before he became

24   a 19, he was never a 19.  Maybe he was a 15 or a 12,

25   a 10.

1    Q    Do you know --

2    A    I don't exactly but I know he was never a

3    19 prior to me.

4    Q    Is he a higher pay grade now than you?

5    A    No.  But he makes more money than I do.

6    Q    Oh, in that office?

7    A    Yes, he does.

8    Q    Oh, he makes more money than you?

9    A    Yes, he does.

10   Q    Okay.  Do you know why?

11   A    I'm thinking because he's white and he's

12   been given bonuses that I haven't received.

13   Q    Do you have any evidence that it's because

14   he's white or do you have any --

15   A    Well, I'm black and I haven't received

16   one.

17   Q    Okay.  Is that the only reason?

18   A    And because they like him.  It's a known

19   -- it's known around the office that he's liked.

20   Q    Okay.  Do you -- let me ask you this:  Who

21   makes the decisions on who gets pay raises or

22   bonuses?

23   A    Managers.

24   Q    Okay.  And who would the managers be that

25   make --

1    A    At the particular time, I do not know.

2    Q    Do performance evaluations have anything

3  to do with pay raises or bonuses?

4    A    It hasn't but I just read that it will be

5  in the future.

6    Q    Okay.  But in the past it did not?

7    A    To my recollection, never.

8    Q    Okay.  Do you know what they base pay

9  raise or promotions on, in the past?

10    A    Excuse me?

11    Q    Okay.  In the past, I assume, people got

12  raises or bonuses at certain points during their

13  work; is that accurate?

14    A    All I can say is during the past years

15  there's been times when managers, these special

16  things come up where they can nominate people that

17  they think that their work was, I guess, above and

18  beyond.

19    Q    Okay.

20    A    Because if it was based on evaluations, I

21  would get one.  So, I would have gotten one, but I

22  didn't.  So it couldn't have been based on

23  evaluations.  It was subjective.

24    Q    And I believe you just previously answered

25  me, you don't know who makes those decisions?

1      A     Managers.

2      Q     Managers.

3      A     Nominates the person.

4      Q     Okay.  And who would have been the

5  manager?

6      A     Whoever his manager was, at the time.

7      Q     Okay.  Do you know who that was?

8      A     No, I do not.

9      Q     Okay.  Now, you mentioned earlier a

10  disciplinary action where you were stripped of a job

11  and you related this to conduct by Ms. Satterwhite.

12  Have there ever been any other disciplinary actions

13  taken against you while you were working for the

14  Florida Department of Revenue?

15      A     Not that I can recall, sir.

16      Q     Have you ever been demoted while working

17  for the Florida Department of Revenue?

18      A     When I requested my file a few months ago

19  it says that I was demoted when the incident

20  happened with Kathy, but I wasn't.  So it actually

21  does say that I was demoted, but I wasn't.  Being

22  laterally transferred is not a demotion.  But my

23  record does indicate that I was.

24      Q     So the lateral transfer had nothing to do

25  with any rate of pay or pay grade or anything like

1    that, as far as you know?

2         A    As far as I know my pay did not change.

3         Q    And you indicate, I believe, you were

4    suspended for a few days for the incident with

5    Ms. Satterwhite where you indicated there was an

6    issue with the test?

7         A    Yes.

8         Q    And that was for three days?

9         A    It was decided that I interfered with the

10   investigation.  I was given three day's suspension.

11        Q    Was that with or without pay?

12        A    Without.

13        Q    Okay.  Any other suspensions or

14   disciplinary measures, that you can recall?

15        A    Not that I can recall.

16        Q    Currently, you don't have any other jobs

17   outside of the Florida Department of Revenue, you

18   don't moonlight somewhere else?

19        A    Yes, I do currently have another job.

20        Q    Okay.  Can you tell me about that?

21        A    I work for Lakeview.

22        Q    And that's over by Baptist Hospital?

23        A    Yes.

24        Q    Okay.  What do you do there?

25        A    I monitor clients.

1     Q    Is that in the mental health unit?

2     A    Yes.  Yes, it is.

3     Q    Who's your supervisor?

4     A    His name is Walter Kemp.

5     Q    Camp?

6     A    Kemp, K-E-M-P.

7     Q    Okay.  What is your job title?

8     A    Patient Tech.

9     Q    What are your hours?

10    A    They vary.

11    Q    Can you just give me, on an average week,

12 what your hours would be?

13    A    I cut them down to, I work one day one

14 week and two days the next.  So what is that --

15 about, approximately, 24 to 32 hours every two

16 weeks.

17    Q    What's your rate of pay?

18    A    It's $8 an hour and it varies by shift.

19    Q    Okay.  If you work a night shift, you get

20 more pay?

21    A    Yes.

22    Q    Okay.  How long have you worked that job?

23    A    Since July of last year.

24    Q    July of 2012 to the present?

25    A    Yes.

1      Q     And what was your reason for taking that

2   job?

3      A     To get some experience in case DR fired

4   me.

5      Q     Other than the present case that we're

6   involved in, have you ever been involved in any type

7   of litigation, whether it's a personal injury case,

8   any other employment related cases, anything where

9   you had a lawsuit and had to go to court or didn't

10  have to go to court but a lawsuit was filed?

11     A     No.  Not a lawsuit but the only thing that

12  I was involved with was an investigation last year

13  with Kathy Satterwhite and Becki Nobles.

14     Q     But that -- I understand about that.  But

15  you haven't been -- you haven't sued anybody for

16  injuries or have you ever been sued because you

17  injured somebody, anything like that?

18     A     Not that I can recall, sir.

19     Q     Okay.  Have you ever made a claim for

20  damages against somebody that maybe didn't go to

21  court or a lawsuit wasn't filed, anything like that?

22     A     Not that I can recall, sir.

23     Q     Okay.  Other than the present case that

24  we're here about today, have you ever had any other

25  employment related claims against any employer?

1    A    No, sir.

2    Q    Okay.  Now, in the documents that your

3    attorney provided to me was documents that were

4    titled diary.  And we will mark that as defense

5    exhibit 2.  Does this constitute -- tell me what was

6    the reason for making this diary?

7    A    Because I was being retaliated against.

8    As soon as Becki, I mean, as soon as Kathy

9    Satterwhite was hired, I felt the hostility coming.

10   Q    Now, did anyone tell you to make a diary?

11   A    I did have a suggestion from my co-worker.

12   Q    A co-worker?

13   A    To start documenting everything.

14   Q    Who was the co-worker?

15   A    Priscilla Phipps.

16   Q    And what is her title?

17   A    She is OA-II.

18   Q    Okay.  So do you know when she become

19   OA-II?

20   A    Kathy Satterwhite got her job.  So she

21   took a voluntary demotion around the same, I guess,

22   it would be before Kathy got hired and that should

23   be '09, not '10.

24   Q    Okay.  2009?

25   A    Correct.

1      Q    Okay.  Now, is Ms. Phipps still an OA-II
2  in your office?

3      A    Yes, she is.

4      Q    Okay.  So are the OA-IIs in your office
5  yourself, Ms. Curtis, Mr. Holway and Ms. Phipps?

6      A    And Kevin Williams.

7      Q    Kathy Williams.  So, there's --

8      A    Kevin, K-E-V-I-N.

9      Q    Williams, Phipps, Curtis Holway and
10  yourself; correct?

11      A    Correct.

12      Q    Ms. Phipps, what is her race and her
13  gender?

14      A    She's white.

15      Q    A white female?

16      A    Uh-huh.

17      Q    What about Mr. Williams?

18      A    He's a white male.

19      Q    And, I believe, we already know that
20  Mr. Curtis and Mr. Holway are white males?

21      A    Correct.

22      Q    Your diary that we've marked as defense
23  exhibit 2, how was that kept?  Did you keep it
24  during the day, did you make it out as things were
25  happening or did you --

1     A    I made it out and as time allowed, I would

2    type it out on my computer.

3     Q    Okay.  At work?

4     A    I don't recall typing it at work.  I know

5    that I did type some at home.  I might have typed

6    some at work.  I don't really recall.

7     Q    Would these have been done the same day as

8    the events described in this diary?

9     A    Yes.

10     Q    To the best of your recollection, does

11    this diary accurately reflect the events, as you

12    recall them?

13     A    Yes.  I would have to look through this

14    and make sure they're not altered.

15     Q    Okay.  Please take your time.

16     A    Okay.  As best I can recollect, these are

17    my notes.

18     Q    And to the best of your recollection, does

19    this diary accurately reflect the events recorded in

20    them?

21     A    To the best of my knowledge.

22     Q    Let me ask you something:  Do you have any

23    sites on social media such as Facebook, Twitter,

24    LinkedIn, MySpace, anything like that?

25     A    No, sir.

1       Q    Okay.  Let me show you the next document I

2  would like to have marked.  This would be defense

3  exhibit 3, the Charge of Discrimination.  And I

4  would like to ask you a few questions about this

5  document we've marked as defense exhibit 3.  This is

6  a document titled Charge of Discrimination.  It has

7  a signature at the bottom dated September 14, 2010.

8  Ms. Salter; is that your signature?

9       A    Yes, it is.

10      Q    Okay.  Did you prepare this document?

11      A    Yes, I did.

12      Q    Okay.  Did you prepare it with the

13  assistance of anyone?

14      A    Yes, I did.

15      Q    And who assisted you?

16      A    I have a consultant.  Her name is Edna

17  Bassett.

18      Q    And what does Ms. Bassett do?

19      A    She just helps people that's being

20  discriminated and harassed.

21      Q    Is she an attorney or anything like that?

22      A    No.

23      Q    Does she work with you?

24      A    No.

25      Q    Do you know where she works?

1   A   She's just a friend.

2   Q   Do you know where she works?

3   A   No.

4   Q   Do you know where she lives?

5   A   No.

6   Q   Do you maintain contact with Ms. Basket?

7   A   Once in awhile.

8   Q   Okay.  So if you needed to contact her,

9   you would -- you could find out where she is?

10   A   I know her phone number.

11   Q   Okay.  But as you sit here today you don't

12   know what she does for a living?

13   A   No, I do not.

14   Q   Do you know any anything about her

15   educational background, whether she has any legal

16   training or anything like that?

17   A   No, I do not.

18   Q   Okay.  On the document it indicates that

19   the discrimination took place from May 12 of 2010 to

20   August 16 of 2010; is that accurate, to the best of

21   your knowledge?

22   A   From that period of time, yes.

23   Q   Okay.  And the particulars of the case,

24   which it says the particulars are and you describe

25   things there, is that accurate to the best of your

1   knowledge?

2       A    Yes.

3       Q    Okay.  Now, as of September 14, 2010, when

4   you signed this document, are the allegations of

5   discrimination that you have described in this

6   document, does that describe, to the best of your

7   knowledge, all of the allegations of discrimination,

8   retaliation you have as of September 14 of 2010?

9       A    I'll have to refer back to my diary and my

10  notes.

11      Q    Okay.  But in providing a Charge of

12  Discrimination to the Florida Commission on Human

13  Relations and the Equal Opportunity Employment

14  Commission, did you understand that you needed to

15  report, to the best of your knowledge, all of the

16  allegations that you had relating to discrimination

17  and retaliation?

18      A    To the best of my knowledge, these are the

19  major things that happened to me during that time

20  period.

21      Q    Okay.  Let me ask you about the Operations

22  Analyst II job as it is performed in your office.

23  Now, you performed duties, obviously, duties as

24  Operations Analyst and you've indicated in your

25  pleadings that you have filed in this case that you

1   believe that Max Curtis and Mike Holway were treated

2   more favorably than you; is that correct?

3        A    I know that they were.

4        Q    Okay.  And they were both white males;

5   correct?

6        A    Yes.

7        Q    Do Mr. Curtis and Mr. Holway, do they do

8   the exact same duties as you?

9        A    At the current time they do.

10       Q    Okay.  Back during the time period where

11  you were alleging that these discriminatory acts

12  were taking place, were they doing the same job

13  duties as you?

14       A    No.

15       Q    What was different about their job duties?

16       A    My job -- my job was more involved.

17       Q    How so?

18       A    I dealt with the public, I deal with

19  interviewing clients, I deal with law enforcement, I

20  deal with vendors, I deal with mortgage companies,

21  lenders.  I deal with irate clients.  I assisted in

22  helping clients straighten up their credit.  I dealt

23  with bankruptcy court's liaisons.  I deal with

24  attorneys.  And they sat and worked lists and

25  entered orders.  They assisted units with lists,

1   like locating clients.  They did things of that

2   nature.

3       Q    Now, what was -- Mr. Holway and Mr. Curtis

4   oversee different areas of responsibility?

5       A    They both did different things.

6       Q    Okay.  So, and tell me if I'm wrong

7   here -- but you -- Operations Analyst II in that

8   office have different areas of responsibility?

9       A    At that time we had different areas of

10  responsibility, yes.

11      Q    Can you tell me what different areas of

12  responsibility Mr. Curtis and Mr. Holway had?

13      A    I do know that Mr. Curtis used to handle

14  situations with monies.

15      Q    Did Mr. Curtis, Mr. Holway and yourself

16  all report to the same supervisor during the time

17  where you're alleging the discrimination and

18  retaliation were taking place?

19      A    Yes.

20      Q    Okay.  And that would have been Ms. --

21      A    Becki Nobles.

22      Q    Nobles.  Did they have anything to do with

23  Ms. Satterwhite?

24      A    Yes.

25      Q    Okay.  So all three of you would have also

1   had to deal with Ms. Satterwhite?

2       A    I was the only one that had an additional

3   list, beside my own normal duties, that I'm aware

4   of.

5       Q    Do you know if Mr. Curtis was doing --

6   completing order entries?

7       A    He was doing that for our enforcement

8   unit.  That's a totally different unit.

9       Q    Okay.  But was that something that you

10  were, also, doing?

11      A    No.

12      Q    Okay.  And Mr. Holway, was he working on

13  locating non-custodial parents, if you know?

14      A    I was told that he was working locations

15  for establishment.  There was three processes,

16  establishment, that's cross functional, and there's

17  enforcement compliance.

18      Q    Okay.  Were those duties that you were

19  doing at the same time that he was?

20      A    Okay.  His role has changed back and

21  forth.  His duties, he initially had some duties and

22  they were taken and given to a less paying -- a less

23  grade, a person doing in a less grade.  Like he's a

24  19 but his job duties were taken away because I was

25  told he was so stressed out and given to a pay grade

1    15 or 16.  It could be a 15 or 16.  And he was given

2    the duties of a person in a lower level.  It only

3    took them three hours a day to do.  So his duties

4    were lessened.  During this time, Michael's duties

5    were lessened.

6         Q    Okay.

7         A    Normally a person that does locate was an

8    RS-II.  And they were allowed to do that one hour a

9    day.  Three analysts did that one hour a day.  But

10   he was given it to do, on a normal basis, as his

11   regular duties.

12        Q    Did he, also, have regular duties?

13        A    Not that I'm aware of.

14        Q    Now, there's allegations in this case

15   about you having to perform time studies?

16        A    Yes.

17        Q    Do you recall that?  And can you tell me,

18   what's the difference between a time-study and a

19   workbook?

20        A    A workbook is where you get -- everybody

21   in the building has workbooks.

22        Q    Okay.

23        A    All the RS-IIs they work out of a

24   workbook.  You work comes in on -- in a workbook and

25   you just work out of a workbook.  You just grab a

1    case out of workbook and you work it.

2        Q    Does that track time?

3        A    No.  Not that I'm aware of.  Not like a

4    time-study.  I know that much.

5        Q    At the time that Mr. Curtis and Mr. Holway

6    were working out of a workbook, were you, also,

7    working out of a workbook?

8        A    No.

9        Q    And you were asked to do a time-study; is

10   that correct?

11       A    Shortly after I went to the managers and

12   told I was being discriminated against, I was told

13   to do -- I was assigned to a work study.

14       Q    Okay.

15       A    Time-study.

16       Q    Okay.  Now, explain to me how a time-study

17   works?

18       A    I don't think they even knew.  This was

19   something made up.  This was a one time thing.  I've

20   never heard of anybody in the Department ever having

21   a time-study done but me.  What it did was every

22   five -- every five minutes, I needed to note what I

23   was doing.  They wanted to know every second what I

24   was spending my time on.  If I went to the Xerox

25   machine, they wanted to know how much time did I

1  spend in the Xerox machine, how long did it take me

2  to do that copy and how long did it take the fax to

3  come back, when did you fax something.  It was very

4  stressful and I was the only one that's been

5  subjected to it in the whole building, since I've

6  been working there, no one has had a time-study but

7  me.

8      Q    Okay.  But, at the time, were they, also,

9  working on workbooks?

10      A    Everybody works out of a workbook.

11      Q    Okay.

12      A    A workbook is not the same thing.  It's a

13  spreadsheet.

14      Q    I understand.

15      A    A workbook is spreadsheet.

16      Q    Now, do you need a time-study completed so

17  a workbook can be completed for a particular

18  employee?

19      A    No.

20      Q    You do not?

21      A    No.

22      Q    Okay.  Why not?

23      A    Why would you have to do a time-study?  A

24  time-study is documenting you every minute of what

25  you do.  A list is just something that you -- that

1    has your cases list on it that you're going to be

2    working for the day.  A time-study is keeping up

3    with everything you're doing on a minute-by-minute

4    basis.  I want to know when you take a break, I want

5    to know when you come back from the bathroom, I want

6    to know when you go to the bathroom.

7         Q    Okay.  So, correct me if I'm wrong but at

8    time --

9         A    I've been doing these duties for over 10

10   years, sir.

11        Q    Okay.

12        A    Why would I need a time-study after I

13   reported that I was being retaliated and harassed?

14        Q    So a time-study, if I understand this

15   correctly, that would allow a supervisor to

16   determine, basically, what you're doing throughout

17   your whole work day; is that what it would do once

18   completed?

19        A    Yes.  Sure, it would.

20        Q    Okay.  And would that information then be

21   used to complete a workbook for each person?

22        A    No, sir.

23        Q    It would not?

24        A    No.

25        Q    Are you currently using a workbook?

1      A    Sir, what I am working off is a list.

2      Q    Okay.

3      A    I am currently working off of a list.  I

4  am given a list of my work.  Everyone is giving a

5  list.  There's not a workbook.

6      Q    Nobody uses workbooks anymore?

7      A    There are workbooks that you put your work

8  on.  But there's a difference in a workbook and a

9  time-study.  Every five minutes I had to identify

10  what I do.

11      Q    How long were you required to perform the

12  time-study?

13      A    First I was told it was going to be two

14  weeks.

15      Q    When did this start?

16      A    August, 2010.

17      Q    Okay.  Then what happened?  Just take me

18  through it.

19      A    First I was told it was going to be two

20  weeks.  Then I was told, no, we need a little more

21  data.  I was never told what this data was going to

22  be for.  After that I was told, no, we need a little

23  bit more.

24      Q    And who told you this?

25      A    Becki Nobles and Rhonda O'Kelley.

1      Q    Okay.  And so you started --

2      A    And I was never given a results list, why

3  it was done, what it was done for, what was the

4  outcome of it.  I was never notified of any of that.

5      Q    So you started doing the time-study in

6  August of 2010; is that correct?

7      A    Shortly after our meeting on July the 22nd

8  where I disclosed of discrimination and harassment,

9  uh-huh.

10     Q    Okay.  And who did you disclose that to?

11     A    Rhonda O'Kelley and Becki Nobles.

12     Q    And how long were you required -- well,

13 strike that.

14          When did you stop having to do the

15 time-study?

16     A    I did it for four weeks.

17     Q    Four weeks.  So from August of 2010

18 through December of 2010 you did the time-study?

19     A    Sir, I don't think four weeks would have

20 been to December.

21     Q    Oh, I'm sorry.  I'm sorry.  From August of

22 2010 to September of 2010, approximately, the

23 time-study?

24     A    I don't recall the exact dates but I know

25 I did it for four weeks.  You should have a copy of

1  the time-study.

2      Q    Okay.  And then after you completed the

3  time-study, what changed?  What were you working off

4  of then?

5      A    I was doing my work as I normally did.  I

6  deal with the public, as the public contacted me.

7  And as I needed to work a case, I worked it.

8      Q    Okay.  How did you, if at all, document

9  your time through the day?

10     A    There was never a need for me to document

11  my time because you never know when a client is

12  going to call, you never know when a lender is going

13  to call, you're never going to know, I mean, this is

14  something I did all day, every day.

15     Q    Okay.  Is there --

16     A    There was no time to keep -- I was so

17  busy, there was no time to keep a record.

18     Q    Okay.  Are employees in your office who

19  are OA-IIs, did they keep some type of diary or list

20  during the day of what they've done, like who

21  they've taken calls from, what cases they worked on,

22  anything of that nature that?

23     A    The OA-IIs?

24     Q    Yes.

25     A    Sir, we had different roles.

1     Q    Okay.

2     A    My role was entirely different from any

3  other OA-II.

4     Q    Okay.

5     A    As I told you, my job was more involved,

6  more detailed.  I deal with the public.

7     Q    Okay.

8     A    I didn't work lists.

9     Q    Okay.  And other OA-IIs, they had

10  different areas of responsibility?

11     A    Yes.

12     Q    Okay.  Did OA-IIs, such as yourself,

13  undergo training courses within the Department, from

14  time to time, in-house trainings?

15     A    As I mentioned before, yes, we do.

16     Q    Do you attend those training sessions

17  together with the other OA-IIs or are they

18  individualized?

19     A    They're all different, sir.  Some require

20  that you have training together and some require

21  that you do it at your desk, by yourself.

22     Q    Okay.  Do you know if the ones that you do

23  at your desk are different than ones that other

24  OA-IIs would do at their desk?

25     A    I would have no way of knowing.

1      Q     Okay.  As you sit here today, do you know

2  anything about Mr. Holway or Mr. Curtis' work

3  history or education, whether they have more or less

4  education than you?

5      A     I do not, sir.

6      Q     And would that same go for work

7  experience, in the past, do you know if they have

8  more or less work experience, more or less technical

9  work experience or do you know?

10     A     I just know that my job was more involved

11  than theirs and that I have been there longer than

12  either of them.

13     Q     Please correct me if I'm wrong, but I

14  thought that you had mentioned that, at least one,

15  at least Mr. Curtis or Mr. Holway, were already an

16  OA-II when you become an OA-II?

17     A     With the Department, I've been at the

18  Department longer than Max or Mike.

19     Q     Okay.  You had been with the --

20     A     As far as OA-II, I told you that me and

21  Max became one at the same time.  As far as being

22  with the Department, I have been there longer than

23  Max and Mike.

24     Q     Do you know if during their tenure at the

25  Department, either one of them held positions that

1   were at a higher pay grade than you while you were

2   working at the same time?

3        A    Not that I'm aware of.

4        Q    Now, I believe you made complaints to your

5   supervisors about the -- you having performed the

6   time-study; is that correct?

7        A    I thought it was unfair, yes.

8        Q    Okay.  And who did you report that to?

9        A    I reported it, as I can recall, I reported

10  it to Rhonda O'Kelley and Becki.

11       Q    And do you feel that you were required to

12  do the time-study as either some type of

13  discrimination because of your race or your gender

14  or because of retaliation?

15       A    Sir, I know that it was.

16       Q    Okay.

17       A    I didn't get any help on the inside with

18  this time-study, which I know was unfair.  So I went

19  outside.  I filed an EEOC complaint because I wanted

20  an objective opinion.  They favored in my behalf

21  because I was retaliated against because of my

22  color, because of my gender and I was retaliated and

23  it was proven by an outside source.

24       Q    Okay.  I'm not asking about what the

25  outside agency found.  I know what they found.  What

1    do you believe or what do you know that leads you to

2    believe that it was because of you having to do this

3    time-study was because of your race or your gender

4    or retaliation?

5         A    Sir, after I reported it them, to my

6    managers, that I felt like I was being treated

7    differently than my two white counterparts, then I

8    was told I had to do a time-study.  Not only that,

9    shortly after I did the time-study, it was now I was

10   going to be monitored.

11        Q    Who was doing your monitoring?

12        A    It was going to be Priscilla Phipps and

13   Kevin Williams.

14        Q    What was Ms. Phipps' title?

15        A    At this particular time, she had been

16   demoted, voluntarily demoted to OA-II.

17        Q    Do you know why she was demoted?

18        A    Because, no, I don't know.  I can't speak

19   to her but I do know she was able to keep her pay,

20   even though she was demoted, she was able to keep

21   her pay.

22        Q    Do you know what she was demoted from?

23        A    She -- Kathy Satterwhite got her job so

24   she was an RA.

25        Q    And RA is?

1      A    A manager.

2      Q    Okay.  What does RA stand for again.

3      A    Revenue Administrator.

4      Q    Revenue Administrator.  What about

5  Mr. Williams?

6      A    Mr. Williams is an OA-II.

7      Q    Okay.  Is he currently an OA-II or is he

8  a I?

9      A    He's still an OA-II.

10     Q    Is he a white male?

11     A    Yes, he is.

12     Q    What about Ms. Phipps?

13     A    She's a white female.

14     Q    Are you the only black female that works

15  in your office?

16     A    In my unit, in the Pensacola office, yes,

17  I am.

18     Q    Okay.  In your position?

19     A    In my position, no, there's other OA-IIs

20  but they don't work for who I work for.

21     Q    Okay.  How many people work in your

22  particular office, approximately?

23     A    I have no idea.

24     Q    Okay.  Are there other black females that

25  work in your office?

60

```
 1        A     We have a few.

 2        Q     And do you know, approximately, how many?

 3        A     Compared to the white, it's very few.

 4        Q     Okay.  What about people of other races?

 5   Are other races involved?

 6        A     Such as --

 7        Q     Asians, American Indians?

 8        A     There's a few.

 9        Q     Okay.  Do you have black males that work

10   in your office?

11        A     None.

12        Q     None?

13        A     The one that we did have, Kathy

14   Satterwhite fired him.

15        Q     How many women work in your office?  Is it

16   more women than men?

17        A     Yes.

18        Q     Okay.  Approximately, what would you say

19   the ratio is of men to women working in your office?

20        A     I can't guess on that, sir.

21        Q     Is there a lot more women than men work in

22   your office?

23        A     I just know that there's more women.

24        Q     Okay.  To your knowledge, has anyone else

25   in that FDOR office ever had to do a time-study,
```